## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ANTONIO JONES** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **WAYNE J. GAVIN, and THE** | : | |
| **ATTORNEY GENERAL OF** | : | |
| **THE UNITED STATES** | : | **NO. 14-804** |

## <u>MEMORANDUM OPINION</u>

**Savage, J.**                                                                                    **August 20, 2019**

In this § 2254 *habeas* case arising out of his murder conviction, state prisoner Antonio Jones claims that his trial counsel was ineffective for failing to impeach two Commonwealth eyewitnesses who identified him as the shooter of the victim. Both eyewitnesses had previously given statements undermining their identification of Jones as the shooter, but trial counsel did not present that evidence to the jury. Jones argues that his trial counsel was ineffective for failing to call two police officers to testify about the statements those witnesses had given that contradicted or significantly undermined their trial testimony.

During state post-conviction proceedings, Jones repeatedly attempted to raise the same ineffective assistance claim. After his counsel failed to raise the claim, Jones filed a *pro se* application to remand and for appointment of new counsel. The Superior Court, following its *Battle* procedure,[1] vacated the lower court's order denying PCRA relief and remanded for an evidentiary hearing. Two years later, abrogating the *Battle* procedure, the Pennsylvania Supreme Court vacated that order. *Comm. v. Jette*, 23 A.3d 1032,

---

[1] *Comm. v. Battle*, 879 A.2d 266 (Pa. Super. Ct. 2005).

1034-35 (Pa. 2011). As a result, despite his persistent efforts throughout the post-conviction process, Jones has never had a merits determination of his ineffectiveness of trial counsel claim.

Jones contends that his claim was barred by an inadequate state procedural rule and should be reviewed on the merits. Alternatively, he argues procedural default of his underlying claim of ineffective assistance of trial counsel is excused under *Martinez v. Ryan*, 566 U.S. 1 (2012).

We conclude that procedural default of the ineffectiveness of trial counsel claim is excused under both the inadequate state procedural rule and *Martinez*. Upon review of the underlying claim, we find that trial counsel's performance was deficient and Jones was prejudiced as a result because there is a reasonable probability that the outcome of the trial would have been different. Therefore, we shall conditionally grant a writ of *habeas corpus*.

## Factual Background

On the morning of February 14, 1999, fifteen-year-old Christopher McClain was shot and killed while sitting in a parked car with two other teenagers, Kenyatta Rucker and Charles Lyles. McClain was in the driver's seat, Lyles in the front passenger seat, and Rucker in the rear seat behind McClain.

McClain had driven to 715 Clearfield Street with Rucker, Lyles, and Jennifer Osorio to pick up Osorio's baby from the home of Marques Riggins, the child's father. Shortly after Osorio went into the home, three males walked out of an alley and passed McClain's parked car. One of them asked the occupants if they wanted to buy weed. When the

boys in the car declined, one of the males on the street started shooting.   Rucker and Lyles both ran to Riggins's house to call the police.

The police arrived at the scene within minutes. The first two officers to respond tended to McClain, who was still alive but unconscious.  Those officers transported him to Temple University Hospital.  Other officers arrived and interviewed witnesses.[2]  Officer Walter Brennan spoke with Lyles, the victim's cousin, who was "screaming & crying".[3] Lyles told Officer Brennan that three black males had approached the car and one of them started shooting. Officer Brennan recorded Lyles's description of what had happened and what the three males had done:

> **#1 was wearing a yellow jump suit with a blue hoodie.** Med complexion, 5'10" – 6'0", he had no hat, **was the shooter** + he fled on foot East on Clearfield toward Kensington. #2 dressed all in black. #3 He could give no information on.
>
> . . .
>
> He said that the deceased was his cousin. He said they were sitting in his cousin's car waiting for the deceased (*sic*) girlfriend when the three males approached + asked the deceased if he wanted to buy some pot. He told them no + the three males walked towards Kensington Ave **when the male in yellow spun around + started shooting.  He ducked down under the dash board.**  When the shooting stopped he shook his cousin to get out of there when he noticed that he was bleeding from the head.[4]

---

[2] Sep. 12, 2000 Trial Transcript ("9/12/00 Tr.") at 23-33 (ECF 43-4); Sgt. Scott Bradley Investigative Interview Record ("IIR") at 1 (ECF 43-24); P/O Richard Boettinger IIR at 1 (ECF 43-22).

[3]  P/O Walter Brennan IIR at 2, 4 (ECF 43-25).

[4]  *Id.* at 2, 3 (emphasis added).

Sergeant Scott Bradley spoke with Rucker at the crime scene. Rucker told him that he had been in the car and had seen the shooters. Sergeant Bradley recorded what Rucker told him:

> He stated that there were three males, and that they fled on foot Eastbound on Clearfield St. He said that the males approached them in the car, and the males came up to them, and there was a short conversation about weed, and then they left, and then they came back and they started to shoot. He didn't say how many had guns. He said that one of them had a **yellow jump suit on.**[5]

Based on the statements of Rucker and Lyles, police radio broadcasted flash information. It reported several black males running from the scene east on Clearfield Street toward Custer Street, one of whom was wearing "some kind of jumpsuit or work suit."

Sergeant Bradley also interviewed Rhonda Riggins, the victim's cousin, who did not see the shooting but saw the shooters shortly beforehand. She told several police officers that the shooters were "Khalil" and "Ed."[6]

Marques Riggins, Rhonda's brother, reported that he saw Khalil Rippy and Edward Thomas running from the scene immediately after the shooting. He told the police that Rippy and Thomas were brothers who sold drugs at Custer and Clearfield Streets, around the corner from the shooting. He did not mention a third man.[7]

---

[5] Bradley IIR at 2 (ECF 43-24) (emphasis added).

[6] *Id.*; P/O Francis Beveridge IIR at 1 (ECF 43-21); P/O Michael Browne IIR at 1 (ECF 43-26).

[7] Boettinger IIR at 2 (ECF 43-22); 9/12/00 Tr. at 33-34 (ECF 43-4).

Rucker, Lyles and Marquis Riggins were taken to a police station where they gave statements to detectives that afternoon. Those statements were not consistent with the ones they had made earlier at the scene.

Lyles gave different descriptions of the shooter and his companions than he had at the scene immediately after the shooting. At the station, Lyles said *two* males came out of the alley. The light-skinned one asked "if we was looking for … weed" and then "the light skinned guy pulled out a gun. I ducked under the dash when I saw the gun. I thought PHER saw it too. Then I heard 2 shots . . . ."[8] Lyles described the two males. According to Lyles the light-skinned male with the gun was 17-18 years old, "5'7 [or] 5'8 with a little nappy Afro," and wearing "a dark blue colored hoody." The other male was darker, shorter, and dressed in "black jeans and a black hoody".[9] From a photo array, he identified Antonio Jones as the shooter and Edward Thomas as the male with the shooter.[10] He said nothing about a yellow jumpsuit or a third male as he had told Officer Brennan earlier.

Rucker's statement to detectives was also inconsistent with what he had described earlier at the scene. He had told Sergeant Bradley that morning that there were three males present at the time of the shooting and one wore a yellow jumpsuit. In his afternoon statement, Rucker did not mention anyone wearing a yellow jumpsuit. He stated:

> Two of the three boys from the other block came out of the alleyway and stood across from our car. The dark skinned boy asked if we wanted weed Man-Man said No. Then the light

---

[8] Det. Peterman IIR at 2-3 (ECF 43-14).

[9] *Id.* at 4.

[10] *Id.* at 6.

skinned boy just pulled out a gun and started shooting. I heard
a couple shots and I ducked down....[11]

As Lyles did, Rucker identified Antonio Jones as the shooter from a photo array. He also identified Khalil Rippy as one of the three males and Edward Thomas as the person who tried to sell them weed. He stated Rippy was not present at the time of the shooting.

Edward Thomas was arrested the next day and charged with murder and related offenses. The charges were later quashed.

Learning that there was an arrest warrant for him, Jones surrendered to police on February 18, 1999. He was charged with the murder of Christopher McClain.

On September 13, 2000, a jury found Jones guilty of third-degree murder, violation of the Uniform Firearms Act, and possession of an instrument of crime. On December 4, 2000, Jones was sentenced to 15-30 years' imprisonment on the murder count and a concurrent term of one to two years' imprisonment on the remaining counts.

## Procedural History

### *Direct Appeal*

After Jones was sentenced, his trial counsel requested leave to withdraw as counsel. The trial judge ordered him to file a notice of appeal within thirty days before withdrawing. Despite the judge's clear instructions, trial counsel did not file a notice of appeal. On June 25, 2001, less than seven months later, Jones filed a *pro se* PCRA petition requesting the court to reinstate his direct appellate rights. The trial court reinstated his appellate rights and appointed counsel.

---

[11] Bamberski IIR at 2 (ECF 43-19).

Appellate counsel raised only sufficiency and weight of the evidence claims. Addressing the merits of only the sufficiency of the evidence claim, the Superior Court affirmed the conviction and sentence on December 19, 2003, in an unpublished memorandum opinion.[12] The Pennsylvania Supreme Court denied *allocatur* on June 30, 2004.[13]

*PCRA Proceedings*

Jones filed a timely *pro se* PCRA petition on December 6, 2004, raising several ineffective assistance of counsel claims.[14] One was that trial counsel failed to preserve a weight of the evidence claim. He based this argument on the inconsistencies between Rucker's and Lyles's trial testimony and their crime scene statements to Sergeant Bradley and Officer Brennan.

After PCRA counsel was appointed and before the PCRA Court considered the petition, Jones filed a *pro se* request to amend his PCRA petition to add the additional claim that trial counsel was ineffective for failing to impeach Rucker and Lyles with extrinsic evidence of their prior inconsistent statements.[15] The PCRA Court did not rule on his request to amend.

On June 14, 2006, PCRA counsel filed an amended PCRA petition. He did not include the claim Jones wanted to make. He raised only the following two claims:

---

[12] *Comm. v. Jones*, 844 A.2d 1282 (Pa. Super. Ct. 2003) ("*Jones* I").

[13] *Comm. v. Jones*, 853 A.2d 360 (Pa. 2004) ("*Jones* II".

[14] This was Jones's first merits post-conviction petition. The prior petition sought only reinstatement of his right to file a direct appeal.

[15] Jones filed his Request for Leave To Amend Petition Under The Post Conviction Relief Act on April 18, 2005.

> 1.    Trial and appellate counsel were ineffective for failing to raise and preserve a weight of the evidence challenge; and
>
> 2.    Trial and appellate counsel were ineffective for failing to investigate and present known alibi witnesses.

On February 1, 2007, the Commonwealth moved to dismiss, contending that the claims lacked merit. The PCRA Court filed a Notice of Intent to Dismiss on February 16, 2007. On February 27, 2007, petitioner requested that PCRA counsel be replaced or he be granted leave to proceed *pro se* pursuant to *Comm. v. Grazier*, 713 A.2d 81 (Pa. 1998).

The PCRA Court, without holding an evidentiary hearing or addressing the request for a *Grazier* hearing, denied relief on April 13, 2007. The court ignored the *pro se* motion to amend the PCRA petition to include the claim of ineffective assistance of counsel for failure to use the witnesses' prior inconsistent statements to impeach their testimony.

Jones filed a *pro se* notice of appeal on April 30, 2007. His court-appointed PCRA counsel also filed a notice of appeal on May 14, 2007, which was docketed in the Superior Court as a separate action. On June 7, 2007, counsel filed a Concise Statement of Matters Complained of on Appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(b) ("1925(b) Statement") in which he raised the same two issues he had at the PCRA level. He did not include the third claim Jones had insisted he present. Jones then filed a *pro se* Application for Remand, arguing that the PCRA Court had ignored his *Grazier* request to proceed *pro se*.

On July 13, 2007, the Superior Court dismissed the *pro se* appeal, ordered that the *pro se* Application for Remand be docketed under the counseled appeal, and remanded the case to the PCRA Court to hold a *Grazier* hearing. At the *Grazier* hearing on September 28, 2007, Jones stated that he did not wish to represent himself and

wanted new counsel appointed. The PCRA Court appointed new counsel to represent Jones. On November 6, 2007, new counsel filed a 1925(b) Statement, listing the same two issues prior counsel had in the amended PCRA petition. Like his predecessor, new counsel did not include the ineffectiveness claim premised on the failure to impeach.

On November 16, 2007, the PCRA Court issued an opinion rejecting the two claims counsel had asserted. The court did not address the failure to impeach claim, concluding that it was waived because it had not been included in the 1925(b) Statement.

On April 14, 2008, in his appellate brief to the Superior Court, counsel raised only one issue. He argued that the PCRA Court had erred in denying an evidentiary hearing on the alibi claim. On May 9, 2008, Jones filed a *pro se* application to remand and for appointment of new counsel. He claimed his then-current counsel was ineffective for failing to include in his 1925(b) Statement the ineffectiveness claim that he had been trying to raise repeatedly since he filed his *pro se* motion to amend his April 2005 PCRA petition. In his application, Jones noted that if counsel had read the transcript of the *Grazier* hearing held on September 28, 2007 and reviewed his *pro se* pleadings, he would have been alerted to the issue.[16] Counsel then filed a petition to remand for appointment of appellate counsel.

On June 11, 2008, pursuant to its *Battle* procedure, the Superior Court denied Jones's *pro se* application to remand and for appointment of new counsel. Instead, the court instructed his second PCRA counsel to address Jones's allegations of appellate counsel's ineffectiveness. Counsel's response was that he "believe[d]" that the failure to impeach issue had "no merit because this issue was not raised before the PCRA/trial

---

[16] Application for Remand and Appointment of New Counsel at 2 (ECF 26-5-6).

court and cannot now be raised for the first time on appeal."[17]  It appears PCRA counsel conflated merits and waiver arguments.

On November 20, 2008, the Superior Court found that the petition to remand to appoint new counsel was deficient because it failed to adequately evaluate and analyze Jones's ineffectiveness claims.[18]  The court noted that Jones was making the same specific ineffectiveness claim that he had previously made in his April 2005 *pro se* petition to amend the PCRA petition to add it.  The court also stated that the amended PCRA petition filed in June 2006 raised "this issue in the context of trial counsel's ineffectiveness for failing to preserve a weight of the evidence claim."[19]  Accordingly, the court concluded that appellate counsel could not "rely on the waiver doctrine."[20]

Additionally, the Superior Court noted that the PCRA Court's opinion addressed the weight of the evidence issue only with respect to Jones's contention that the two witnesses lacked credibility because they had been given "deals" on unrelated drug charges in exchange for their testimony against Jones.  This statement is not entirely accurate. The PCRA Court did examine the weight of the evidence claim in light of the assertion that the Commonwealth witnesses had not consistently identified Jones as the shooter.  Specifically, after analyzing Lyles's and Rucker's testimony, the PCRA Court concluded that they "never wavered in their identification of Petitioner as the shooter. Neither man ever identified Petitioner's cohort, Edward Thomas, as the shooter, but as

---

[17] Pet. to Remand to the Ct. of Common Pleas for Appt. of New Appellate Counsel at 2 (ECF 26-6).

[18] *Comm. v. Jones* ("*Jones III*"), 1294 EDA 2007 (Pa. Super Ct. Nov. 20, 2008) (ECF 26-6 at 20).

[19] *Id.* at 3.

[20] *Id.* at 7.

the man who asked them if they wanted marijuana.  . . .  [T]he men testified that within hours of the shooting each of them had identified Petitioner as the shooter from a photo array presented to them by the police."[21]

Because neither the PCRA Court nor counsel in his petition to remand analyzed the ineffectiveness claim regarding the impeachment of Rucker and Lyles by their prior inconsistent statements, the Superior Court concluded that the issue "was never properly presented or reviewed," and, consequently, it could not "adequately review the ineffectiveness claim raised in Jones's *pro se* petition" and was "left to speculate as to the alleged prior inconsistent statements."  It directed counsel to amend the petition to remand by providing a "careful evaluation" and analysis of Jones's *pro se* ineffectiveness claim "rather than relying on a finding of waiver."[22]

In response to the Superior Court's directive, counsel filed a supplemental amended PCRA petition arguing that Jones's trial counsel was ineffective when he failed to call Officer Brennan and Sergeant Bradley who would have impeached and contradicted the trial testimony of Rucker and Lyles about what the shooter was wearing. He accurately explained that both witnesses had initially told police there were three perpetrators and that the shooter wore a yellow jumpsuit, but testified at trial that there were only two assailants and neither was wearing a jumpsuit.  He also noted that Marques Riggins testified that the person wearing a yellow jumpsuit was not Jones.  Counsel

---

[21] *Comm. v. Jones ("Jones IV"),* 1294 EDA 2007 at 8-10 (Phila. Ct. Com. Pleas, Nov. 10, 2007).

[22] *Jones III* at 7-8.  It appears that the court mistakenly remanded the matter and intended that counsel only amend his petition for remand.

asserted that the claim of ineffectiveness for failure to impeach the witnesses "has not been waived by the defendant."[23]

On April 7, 2009, the Superior Court vacated the order denying PCRA relief.[24] Based on the inconsistencies between the trial testimony of Rucker and Lyles, and their earlier statements to police, it determined that Jones was entitled to an evidentiary hearing on the issue of whether trial counsel was ineffective for failing to call the two police officers to impeach the testimony of the two Commonwealth eyewitnesses with their prior inconsistent statements. The court noted that although trial counsel was aware of and suggested during his cross-examination that the two witnesses had given prior inconsistent statements to police, he did not introduce evidence of those statements to confirm his suggestion.

Because "identification [was] the critical issue and the prior inconsistent statement relate[d] to that identification," the Superior Court stated that there may have been ineffectiveness "where that statement would corroborate the defense theory that Jones was not the shooter and thus change the outcome of trial."[25] Notably, the court stated:

> "Had the jury heard this evidence, it may have cast serious doubt on the veracity of the eyewitnesses. Without a hearing on this issue, we are unable to discern whether counsel had a reasonable basis for hinting at this evidence, but not following through with it."[26]

---

[23] Supp. Am. Pet. Under Post-Conviction Relief Act at 2 and Mem. of Law in Supp. at 1-2 (ECF 26-6).

[24] *Comm. v. Jones* ("*Jones V*"), 1294 EDA 2007 (Pa. Super Ct., Apr. 7, 2009) (ECF 26-6 at 40).

[25] *Id.* at 3-4 (ECF 26-6 at 42-43). The court noted that a failure to call a particular witness is ineffective if it is shown that the absent witness's testimony would have been helpful in establishing the asserted defense. *Id.* at 7-8 (citing *Comm. v. Durst*, 559 A.2d 504, 506 (Pa. 1989)).

[26] *Id.* at 8 (ECF 26-6 at 47).

Thus, it vacated the order dismissing Jones's PCRA petition and remanded for an evidentiary hearing, a hearing that would never take place in state court.

On April 30, 2009, the Commonwealth filed a petition for *allocatur* to the Pennsylvania Supreme Court, arguing that the *Battle* procedure should be abrogated because it contravened the Pennsylvania rule barring hybrid representation. Essentially, the Commonwealth contended that the Superior Court had erred in considering the issue Jones had raised *pro se* while represented by counsel. The Supreme Court stayed the *allocatur* petition while it considered the validity of the *Battle* procedure in a pending case, *Comm. v. Jette*, 40 EAP 2009. Almost two years later, in *Jette*, the Supreme Court invalidated the *Battle* procedure. *Jette*, 23 A.3d at 1032. The *Jette* Court found that the Superior Court in *Battle* had misinterpreted the Supreme Court's decision in *Comm. v. Ellis*, 626 A.2d 1137 (Pa. 1993), which had held that a criminal defendant has no right to hybrid representation in either trial or appellate courts. *Jette,* 23 A.3d at 1038. It held that the "*Battle* Procedure as applied to address *pro se* claims of appellate counsel's ineffectiveness while that counsel is still representing the appellant is in contravention of this Court's long-standing policy that precludes hybrid representation." *Id.* at 1036 (citations omitted). Thus, it held that any *pro se* pleading filed by a represented PCRA petitioner is to be forwarded to counsel without commentary; and, if counsel still refuses to address the *pro se* issues, the petitioner's only recourse is to proceed *pro se* or retain new counsel. *Id.* at 1042.

On September 14, 2011, in Jones's case, the Supreme Court granted the Commonwealth's petition for allowance of appeal, vacated the Superior Court's April 2009 decision, and remanded the case for reconsideration in light of *Jette*. On July 20, 2012,

the Superior Court again vacated the lower court's order denying PCRA relief, concluding

that the Superior Court had met the requirements of *Jette* in its April 2009 decision.

The Commonwealth again sought allowance of appeal in the Pennsylvania

Supreme Court, which granted *allocatur*, vacated the Superior Court's July 2012 decision,

and remanded the case again for reconsideration in light of *Jette*. The Supreme Court

explained:

> [T]he Superior Court's November 20, 2008 and April 7, 2009
> decisions did not exercise the judicial restraint dictated by
> *Jette*. Rather than simply forwarding [petitioner's] *pro se*
> filings [to his attorney] as *Jette* would dictate, the Superior
> Court took the additional *Battle* step of ordering counsel to
> submit a petition for remands [sic], which the court then
> evaluated. When that court-ordered response by counsel was
> deemed insufficient, the Superior Court took the further step
> of ordering counsel to submit yet another petition for remand.
> Upon evaluating the new petition, the court remanded both for
> an evidentiary hearing and to appoint new counsel. Those
> directives did not comport with our *Jette* directive that,
> following the forwarding of *pro se* filings to counsel, the court
> is to take no other action unless counsel forwards a motion.
> The remand petitions forwarded by counsel here were
> required by the Superior Court, employ[ing] the since-
> disapproved procedure in *Battle*.

*Comm. v. Jones*, 58 A.3d 751, 751 (Pa. 2012). The Supreme Court instructed the

Superior Court to limit its review to the issue originally presented in the appellate brief.

*Id.* at 752. It effectively barred the PCRA Court from considering the ineffectiveness claim

Jones had been pressing for over eight years.

On June 7, 2013, the Superior Court issued a decision affirming the order of the

PCRA Court denying PCRA relief.[27] In its opinion, the court examined only the original

issue raised in the counseled brief on PCRA appeal, namely, that trial counsel was

---

[27] *Comm. v. Jones* ("*Jones VI*"), 82 A.3d 456 (Pa. Super. Ct. 2013).

ineffective for failing to investigate and present known alibi witnesses. The Superior Court agreed with the PCRA Court that the alibi claim lacked merit. Jones's petition for *allocatur* was denied on October 13, 2013.[28] Thus, the Pennsylvania courts have never decided whether trial counsel was ineffective for failing to impeach the Commonwealth's identification witnesses by their prior inconsistent statements -- the issue Jones has continually attempted to present since seeking to amend his first PCRA petition.

### Federal Habeas Proceedings

Jones filed his timely *pro se habeas* petition, raising the following claims:

> (1)    Trial counsel was ineffective for failing to impeach the two Commonwealth witnesses, Lyles and Rucker, with prior inconsistent statements that contradicted their trial testimony regarding their identification of the petitioner as the shooter.

> (2)    Jones was denied due process because the evidence, based on Lyles's and Rucker's faulty identification of Jones as the shooter, was insufficient to support his conviction.[29]

In response, the Commonwealth argued that the first claim was unexhausted, procedurally defaulted and meritless. It contends that despite Jones's assertion that he had raised the issue in his *pro se* PCRA petition, he did not raise it in his initial *pro se* PCRA petition as an ineffective assistance of counsel claim. Nor was it raised in the amended PCRA petition filed by his appointed PCRA counsel. The Commonwealth also noted that Jones's second PCRA counsel declined to identify the issue in the Rule 1925(b) Statement and his brief. As to the second claim that the evidence was

---

[28] *Comm. v. Jones* ("*Jones VII*"), 78 A.3d 1090 (Pa. Oct. 29, 2013) (table).

[29] Pet. for Writ of *Habeas Corpus* (ECF 1).

constitutionally insufficient to sustain the conviction, the Commonwealth argues it must fail because the Superior Court's decision finding the evidence sufficient was plainly reasonable.[30]

Magistrate Judge Sitarski, to whom the petition was referred for a report and recommendation, appointed counsel and ordered an evidentiary hearing on the ineffective assistance of counsel claim. In his counseled brief,[31] Jones argued that PCRA counsel's failure to raise the ineffective assistance of counsel claim during the initial PCRA proceedings constituted cause and prejudice to overcome the procedural default of his constitutional claim. In a supplemental brief, Jones contended alternatively that the *Jette* rule that barred him from obtaining review of his claim by the PCRA Court was inadequate.

On June 17, 2015, the magistrate judge conducted an evidentiary hearing regarding the claims that trial counsel was ineffective for failing to impeach the Commonwealth's eyewitnesses with their prior inconsistent statements, and the allegation that PCRA counsel was ineffective for failing to raise and litigate the ineffectiveness for failure to impeach claim. Both attorneys testified at the hearing. In his post-hearing brief, Jones contended that he established cause and prejudice to overcome procedural default of his ineffectiveness claim under *Martinez*, because he had demonstrated that counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under *Strickland v. Washington*, 466 U.S. 668

---

[30] Resp. to Pet. Writ of *Habeas Corpus* (ECF 20).

[31] Jones chose not to proceed on his second claim for relief regarding the sufficiency of the evidence. Mem. of Law in Supp. of Pet. for Writ of *Habeas Corpus* at 1 n.1 (ECF 25).

(1984), and the underlying ineffective assistance of trial counsel claim was substantial because it has merit.[32]

Magistrate Judge Sitarski, in a thorough and thoughtful report, recommended that the *habeas* petition be denied. She concluded that *Martinez* did not excuse the default because the ineffectiveness claim was not substantial and PCRA counsel was not ineffective.[33] She found that trial counsel engaged in "active and capable advocacy," and his failure to call the police officers for impeachment purposes did not have an objectively unreasonable basis. Similarly, she found that PCRA counsel's representation was not constitutionally ineffective under *Strickland* when he failed to raise the defaulted claim of ineffective assistance of trial counsel.

Magistrate Judge Sitarski also rejected Jones's alternative ground to excuse the procedural default of his claim on the basis that the *Jette* rule was an inadequate bar. She found that because Jones conceded that his claim of ineffective assistance of counsel for failure to impeach was not exhausted in state court, his inadequate bar argument was inconsistent with his other stated ground to excuse the default of his claim for relief.

## Analysis

### *The Exhaustion Requirement and Procedural Default Doctrine*

Before the federal court may consider a *habeas* petitioner's federal claim, the petitioner must exhaust his state court remedies. 28 U.S.C. § 2254(b)(1). To exhaust a claim, the state prisoner must demonstrate that each of his claims was "fairly presented"

---

[32] Pet.'s Post-Hearing Brief at 17 (ECF 49). We agree that the sufficiency of the evidence claim is meritless.

[33] R&R at 41-49 & n.18 (ECF 51).

to the state court before bringing it in federal court.  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) (*per curiam*).

When a petitioner fails to demonstrate that he has exhausted his available state remedies, his unexhausted claims must be dismissed.  *Coleman v. Thompson,* 501 U.S. 722, 731 (1991) (citations omitted).  However, if state law clearly bars further state court review of an unexhausted claim, the federal court will excuse the failure to exhaust under 28 U.S.C. § 2254(b)(1)(B)(i) and consider the claim "not unexhausted" where there is technically a lack of available state corrective process.  *Wenger v. Frank*, 266 F.3d 218, 223 (3d Cir. 2001).  A procedurally defaulted claim may be considered in a federal *habeas* petition only if there is a basis for excusing the default.  *Id.*

A claim may be procedurally defaulted where a petitioner fairly presents it to the state courts, but the last state court to which the claim was presented declines to address it on the merits and denies it because of an "independent and adequate state procedural rule."  *See, e.g.*, *Rolan v. Coleman*, 680 F.3d 311, 317 (3d Cir. 2012).  A rule is "independent" if it is not dependent on any federal constitutional question.  *See Johnson v. Pinchak*, 392 F.3d 551, 557 (3d Cir. 2004).  It is "adequate" if it was "'firmly established, readily ascertainable, and regularly followed at the time of the purported default.'"  *Leyva v. Williams*, 504 F.3d 357, 366 (3d Cir. 2007) (quoting *Szuchon v. Lehman*, 273 F.3d 299, 325, 327 (3d Cir. 2001)).  These conditions must have existed at the time of the purported procedural error that led to the eventual state court bar against the petitioner's claim, not when the state court actually holds the claim barred.  *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991).

Jones concedes his ineffectiveness of counsel claim is procedurally defaulted. He contends that the reason his claim was not decided on the merits is because the Pennsylvania rule barring review was not adequate. He also argues that the procedural default is excused under *Martinez*.

*Jones's Inadequate Bar Claim*

The ineffectiveness claim was procedurally defaulted because it was not raised in the state court proceedings. It was not raised because PCRA counsel failed to raise it, not because Jones failed to do so. Jones repeatedly sought to present the claim by filing his own pleadings.

To assert his claim of ineffective assistance of counsel, Jones followed and the Superior Court applied the *Battle* procedure, requiring post-conviction counsel to cite the alleged ineffectiveness and to report his evaluation of the *pro se* claim. Pursuant to its established *Battle* procedure, the Superior Court, after considering counsel's evaluation, was required to either appoint new counsel or direct the defendant to proceed *pro se* or with retained counsel.

While Jones was pursuing his claim via the *Battle* procedure, the Pennsylvania Supreme Court abrogated the procedure. *Jette*, 23 A.3d at 1034-35. Consequently, a defendant could no longer obtain a merits review of an ineffectiveness claim that his post-conviction counsel had failed or refused to pursue despite his unequivocal and articulated desire that he do so. The Pennsylvania Supreme Court applied *Jette* retroactively, ending Jones's persistent efforts to have his claim considered on the merits.

In his objections, Jones contends that the magistrate judge misapplied the adequate bar doctrine. He argues that the *Jette* rule that precluded review of his claim by

the PCRA Court on the merits was inadequate. He states that the procedural default of his ineffective assistance for failure to impeach claim occurred at the PCRA level in June 2006, when his first PCRA attorney failed to raise and litigate the claim in his counseled PCRA petition and when his new attorney failed to do so after replacing PCRA counsel in November 2007.[34] Jones asserts that by invoking the *Battle* procedure, he overcame default by securing a remand from the Superior Court. Jones relied on the *Battle* procedure to present the claim that his PCRA counsel did not raise. He contends that after the Superior Court remanded for an evidentiary hearing, the claim was on a path to exhaustion, but he hit a dead end when the Pennsylvania Supreme Court abolished the *Battle* procedure in *Jette* and then applied *Jette* retroactively to his case, precluding exhaustion of his claim.

Jones asserts that because the *Jette* rule was not announced until 2011, it was not "firmly established, readily ascertainable, [or] regularly followed" at the time of the purported default.[35] Thus, he argues, the *Jette* rule is plainly inadequate to bar federal *habeas* review, permitting federal review of the merits of his claim *de novo.*

After the Superior Court remanded the claim to the PCRA Court for an evidentiary hearing and before *Jette* came down, Jones was in limbo. The claim he diligently pursued was placed on hold while awaiting a decision in *Jette.* Had *Jette* not applied retroactively, Jones would have had a merits review of his claim.

Jones's claim was not barred by a firmly established ban on hybrid representation. He relied on a regularly followed procedure that had been available when he filed his *pro*

---

[34] Supp. Mem. of Law in Support Pet. for Writ of *Habeas Corpus* at 2-3 & n.2 (ECF 32).

[35] *Id.* (quoting *Szuchon*, 273 F.23d at 325).

*se* claim. The claim was procedurally defaulted when the Pennsylvania Supreme Court applied *Jette* to his case years later.

The *Jette* rule was not clearly established when Jones presented his claim. On the contrary, Jones followed the established *Battle* procedure in effect when he repeatedly filed his pleadings to have his claim decided on the merits. Therefore, as applied in his case, the *Jette* rule was not an adequate bar.

As the *Jette* Court explained, the Superior Court in *Battle* had misinterpreted the Supreme Court's decision in *Ellis*, 626 A.2d 1137, which held that a criminal defendant has no right to hybrid representation in either trial or appellate courts. It announced that *Ellis* did not authorize, let alone mandate, the filing of a petition for remand seeking the appointment of new counsel whenever a represented appellant alleges ineffectiveness of his current counsel. *Jette,* 23 A.3d at 1038. The court in *Jette* held that the *Battle* procedure, as applied to *pro se* claims of appellate counsel's ineffectiveness while that counsel is still representing the appellant, "is in contravention of this Court's long-standing policy that precludes hybrid representation." *Id.* at 1036 (citations omitted). Abolishing the *Battle* procedure, the *Jette* Court dictated that any *pro se* pleading filed by a represented PCRA petitioner is to be forwarded to counsel without commentary, and if counsel still refuses to address the *pro se* issues, the petitioner's only recourse is to proceed *pro se* or retain counsel. *Id.* at 1042.

The problem, as the Supreme Court saw it, was that contrary to the Superior Court's jurisprudence and understanding, hybrid representation had been barred since 1993 when the Pennsylvania Supreme Court decided *Ellis*. In *Jette*, the court reiterated that principle. What instigated its restatement of the hybrid representation rule was the

Superior Court's *Battle* procedure permitting hybrid representation despite the *Ellis* holding. The *Battle* procedure was consistently applied after *Ellis* and before *Jette*. Between the *Ellis* and the *Jette* decisions, the ban against hybrid representation was not firmly established, nor readily ascertainable. Had it been, the Pennsylvania Supreme Court would not have had to issue the *Jette* decision, clarifying *Ellis* and abrogating the *Battle* procedure.

We conclude that Jones was precluded from asserting his ineffectiveness claim by an inadequate procedural bar. Additionally, his procedurally defaulted claim that his trial counsel was ineffective for failing to impeach was not exhausted because PCRA counsel did not present it. Hence, Jones also relies on the *Martinez* exception.

In Coleman, the Supreme Court held that post-conviction counsel's negligence does not establish cause excusing default. 501 U.S. at 753-54. In *Martinez*, the Supreme Court announced a "narrow exception" to the *Coleman* rule. *Martinez, 566* U.S. at 9. It held that "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal *habeas* court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id.* at 17. The Court limited its holding to those cases where state procedural law barred defendants from raising claims of trial counsel's ineffectiveness on direct appeal and instead required them to be first raised in an initial-review collateral proceeding, the first collateral proceeding in which the claim could be heard. *Id* at 18.

To qualify under the *Martinez* exception, the petitioner must satisfy three requirements. He must show that: (1) the claim of ineffectiveness of trial counsel is substantial, that is, it has "some merit"; (2) the default was caused by counsel's ineffectiveness or the lack of counsel on collateral review; and (3) state law requires a petitioner to raise a claim of ineffectiveness in initial-review collateral proceedings rather than on direct review. *Id.* at 14-17.

The third requirement is satisfied. Pennsylvania requires a defendant to raise a claim of trial counsel's ineffectiveness on PCRA review. Thus, for the exception to apply, Jones must show that: (1) the procedurally defaulted claim of trial counsel's ineffectiveness has "some merit;" and (2) post-conviction counsel was ineffective under the *Strickland* standard.

To satisfy the threshold requirement that his claim has "some merit", the petitioner must "show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). This standard is not as demanding as a merits determination under *Strickland*. "At this stage, what is important is that the underlying ineffective assistance-of-trial-counsel is 'substantial', not that a petitioner has, in fact, been 'prejudiced' by trial counsel's deficient performance under *Strickland*." *Workman v. Superintendent Albion SCI*, 915 F.3d 928, 938 (3d Cir. 2019). Hence, for purposes of the *Martinez* analysis, the standard for evaluating the underlying claim of trial counsel's ineffectiveness is "less exacting than *Strickland* prejudice." *Id.* at 939.

So compelling was the ineffectiveness of trial counsel claim that the Superior Court found that the prior inconsistent statements of the eyewitnesses "would corroborate the defense theory that Jones was not the shooter and thus change the outcome of trial."[36] It concluded that:

> Had the jury heard this evidence, it may have cast serious doubt on the veracity of the eyewitnesses. Without a hearing on this issue, we are unable to discern whether counsel had a reasonable basis for hinting at this evidence, but not following through with it.[37]

Jones has demonstrated that his claim has some merit. He has shown that reasonable jurists, a three-judge Superior Court panel, debated the issue. The panel, in remanding for an evidentiary hearing, found the issue worthy of proceeding further.

The Superior Court determined the issue was significant enough to instruct new PCRA counsel to file an amended petition, and to carefully evaluate and analyze the ineffectiveness claim rather than treat it as waived. After counsel did so, the Superior Court, finding the claim substantial enough for further evaluation, remanded for an evidentiary hearing on the ineffectiveness claim.[38]

There is no question the claim had substantial, not just some, merit. Thus, Jones has satisfied the first requirement necessary to invoke the *Martinez* exception.

The second *Martinez* requirement is that the petitioner must show that post-conviction counsel was ineffective under the *Strickland* standard. If he fails to do so, procedural default is not excused.

---

[36] *Jones V* at 3-4.

[37] *Id.* at 8.

[38] As we have noted, an evidentiary hearing was not held because the Pennsylvania Supreme Court barred consideration of the claim when it abrogated the *Battle* procedure.

We analyze the ineffectiveness of counsel claim under the two-part *Strickland* test. First, the petitioner must demonstrate that his attorney's performance was deficient. He must show that "counsel's representation fell below an objective standard of reasonableness," considering all of the surrounding circumstances of the particular case and the facts viewed at the time of counsel's conduct. *Strickland*, 466 U.S. at 687-89. Second, he must show that the deficient performance prejudiced him. *Id.* at 692. The prejudice prong requires a showing that absent the deficient representation, a reasonable probability exists that the result of the proceedings would have been different. *Id.* at 694. A reasonable probability is one that is "sufficient to undermine confidence in the outcome." *Id.* In other words, the prejudice component focuses on whether counsel's deficient performance renders the result of the proceedings unreliable or fundamentally unfair. *Williams v. Taylor*, 529 U.S. 362, 393 n.17 (2000). The test is one of probability, not certainty.

In his initial *pro se* petition, Jones did not specifically assert that his trial counsel was ineffective for failing to impeach the two eyewitnesses. Instead, he couched his claim as a weight of the evidence argument, citing the inconsistencies between the witnesses' testimony and their earlier statements at the scene. But, while his petition was pending, Jones filed a *pro se* request to amend it to add the claim for trial counsel's failure to impeach the witnesses by their earlier statements to the police. Consequently, his appointed PCRA counsel knew or should have known from a review of the record that Jones wanted to amend the petition to include the ineffectiveness claim for failure to impeach. PCRA counsel did not do so. He ignored it. Consequently, the claim was not

presented in the first PCRA proceeding because PCRA counsel failed to include it, not because Jones failed to raise it.[39]

"There is a 'strong presumption' that an attorney's decision to pursue some claims and decline to pursue others is a tactical choice." That presumption can be overcome "by showing that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Workman*, 915 F.3d at 942 (quoting *McKee v. United States*, 167 F.3d 103, 106 (2d Cir. 1999)).

The omission of the ineffectiveness claim was not a tactical choice. At the evidentiary hearing, PCRA counsel could not articulate a reason why he did not pursue the claim. He did not suggest that it was a tactical choice. Accordingly, there was no rational strategic basis for counsel's failure to present the claim.

Counsel failed to communicate with Jones before filing a counseled petition. He neither met nor spoke with Jones. Although he did review trial counsel's file, PCRA counsel did not discuss the case with him. But, a review of the record would have revealed that Jones himself had raised the issue before the PCRA Court in his *pro se* petition to amend his petition and his *pro se* filing in the Superior Court. Consequently, PCRA counsel, assuming he reviewed the record as he should have, was aware of the issue. Hence, PCRA counsel could not deny he was on notice of the claim.

Having been alerted to the issue, PCRA counsel had an obligation to determine whether it had arguable merit before deciding not to include it in the amended petition. He did not. Had he done so, he would have recognized, as the Superior Court did, that the issue had merit. Yet, he could not explain why he did not present it. In short, the

---

[39] The PCRA Court inexplicably did not rule on the *pro se* motion to amend the petition to include the claim.

issue was not presented as a result of PCRA counsel's lack of diligence, not an exercise of judgment.

Jones has rebutted the presumption that PCRA counsel's failure to raise the issue of trial counsel's failure to impeach was a tactical choice. He has shown that counsel's performance was deficient. He has also demonstrated, as the Superior Court found, that his underlying claim has some merit. Therefore, the procedural default of his ineffectiveness of trial counsel claim is excused under *Martinez*.

*The Ineffectiveness of Trial Counsel Claim*

Having concluded that procedural default of the ineffectiveness claim is excused by both an inadequate state procedural bar and the *Martinez* exception, we consider the claim of trial counsel's ineffectiveness. In doing so, we recognize the distinction between claims that have been adjudicated on the merits and those that have not means the difference between highly deferential AEDPA review and *de novo* review. Where the state courts did not reach the merits of a claim or failed to examine the petitioner's constitutional claims in light of federal constitutional law, the claim is reviewed *de novo*. *Cone v. Bell*, 556 U.S. 449, 772 (2009); *Jacobs v. Horn*, 395 F. 3d 92, 100 (3d Cir. 2005). Thus, because the state court did not reach the merits of the ineffectiveness of trial counsel claim, we shall review Jones's ineffectiveness of trial counsel claim *de novo*. *Collins v. Sec'y of PA Dept. of Corrections*, 742 F.3d 528, 544 (3d Cir. 2014) (citing *Porter v. McCollum*, 558 U.S. 30 (2009) ("Because the state court did not decide whether [the prisoner's] counsel was deficient, we review this element of [his] *Strickland* claim de novo."); *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001) (applying *de novo* review when

Pennsylvania Supreme Court never considered petitioner's constructive denial of counsel claim, and instead treated claim as one of ineffective assistance of counsel)).

Addressing trial counsel's performance, Jones argues that counsel's failure to impeach the identification testimony of two eyewitnesses was objectively unreasonable. He points to the inconsistencies and contradictions between their initial statements and later testimony that were obvious to counsel. Both Lyles and Rucker had given descriptions of the shooter and his cohorts to the police officers at the scene shortly after the shooting that were inconsistent with statements they later gave to detectives. Lyles described the shooter to an officer at the scene as wearing a yellow jumpsuit. Rucker also told another responding officer that one of the males "had a yellow jumpsuit on." In their more detailed statements to detectives later that day, neither stated that anyone was wearing a yellow jumpsuit. Both told the detectives only two males were involved even though they had told officers at the scene that there were three.

At trial, Rucker and Lyles testified as eyewitnesses. Their trial testimony was not consistent with their initial statements. Rucker testified that there were three males on the corner before the shooting, and Khalil Rippy, whom he knew from school, was one of them. On direct examination, Rucker testified that Jones, the only defendant on trial, and another male came out of the alley immediately before the shooting. He testified that Jones had been the shooter and he picked Jones's photograph from an array at the police station.[40]

On cross-examination, Rucker testified that he did not recall what Jones or anyone else was wearing. He claimed he did not remember talking to the police at the scene. He

---

[40] Sept. 8, 2000 Tr. at 56 (ECF 43-2).

acknowledged he had given a statement at the police station, telling the police that there were two males, one dark-skinned and the other light-skinned. He identified Jones as the light-skinned one.[41] He also admitted having identified a photograph of Khalil Rippy as one of the males standing on the corner when he and his friends first drove around the block, but denied that Rippy was there when the shooting happened.[42]

Lyles testified that Edward Thomas was one of the three males on the corner before the shooting and Jones was not there when they first arrived.[43] He identified Jones and Thomas as the two males who later came out of the alley moments before the shooting. He testified that Jones pulled a gun and started firing. He did not recall what the shooter was wearing.[44] Nor did he remember having told the police at the scene that the shooter was wearing a yellow jumpsuit.

Lyles testified that at the police station he gave a statement identifying Jones as the shooter.[45] Portions of that statement were read into the record, including the portion where he stated that Jones had been wearing a dark blue hoody.[46]

On cross-examination, trial counsel questioned Lyles about his statement to police at the crime scene:

> Q:    Do you recall talking - do you recall at the scene talking to any police officers who interviewed you?
>
> A:    Not at the scene.

---

[41] *Id.* at 87-88.

[42] *Id.* at 110-11.

[43] *Id.* at 142-43.

[44] *Id.* at 149-52.

[45] *Id.* at 128-29.

[46] *Id.* at 153-54.

Q:    You don't. Do you remember a Police Officer Brennan who arrived on the scene?

A:    No.

. . . .

Q:    Do you recall - do you recall talking to an Officer Brennan on the scene; is that what you're saying?

A:    Not that I remember, no.

Q:    You don't recall telling him that -

A:    Yeah, yeah, that's the cop that took me down to the station. I do remember.

Q:    Do you remember telling him that one of the -- one of the males had a yellow jumpsuit on with a blue hoody?

A:    Nope.

Q:    No. You don't recall telling him that he had medium complexion, he was about 5'10" to six feet tall?

A:    I probably told him his height, but I don't know nothing about no clothes he had on. . .

Q.    But you don't recall telling him about a yellow jumpsuit?

A:    Nope.

Q:    So if he were to testify to that, would he be telling the truth or would he be lying?

A:    Like I said, I don't remember telling him he had on a yellow jumpsuit.[47]

---

[47] *Id.* at 160-62.

At this point, defense counsel did not confront Lyles with the description he had given Brennan. Counsel had Brennan's statement that showed Lyles had told him the shooter was wearing a yellow jumpsuit.

The significance of the yellow jumpsuit is apparent in Riggins's testimony which demonstrated that Jones was not wearing a yellow jumpsuit but another man was. He testified that, awakened by screaming, he looked out a second-story window. He saw four men running down Kensington Avenue and turning left on Custer Street. He knew three: "Tone" (Antonio Jones), Khalil Rippy, and Ed Thomas. He did not recognize the fourth male. On direct examination, Riggins testified that he did not recall what the males were wearing. But, on cross-examination, he remembered the fourth male, the one he did not know, was wearing a yellow jumpsuit:

> Q.    Did you see a boy, if you remember, someone wearing a yellow jumpsuit?
>
> A.    Yeah, I think one of them did have yellow on.
>
> Q.    One of them had a yellow jumpsuit?
>
> A.    Yeah.
>
> Q.    And that one that you saw that had the yellow jumpsuit, that the one whose name you didn't know?
>
> A.    Yeah, I think so, yeah.[48]

Riggins's testimony proved that Jones was not the man in the yellow jumpsuit. Riggins, who knew Jones and whom he referred to as "Tone", did not know the man in the yellow jumpsuit. It was not Jones. Thus, his testimony taken together with Lyles's

---

[48] Sept. 11, 2000 Tr. at 33 (ECF 43-3).

and Rucker's statements at the scene that the shooter wore a yellow jumpsuit eliminated Jones as the shooter.

Defense counsel did not call Sergeant Bradley or Officer Brennan to testify about the statements taken from Rucker and Lyles at the scene immediately after the shooting. Consequently, as the Superior Court later found, the jury did not hear the evidence that could have "cast serious doubt on the veracity of the eyewitnesses"[49] and "would [have] corroborate[d] the defense theory that Jones was not the shooter and thus change the outcome of trial." [50]

Once Lyles stated that he did not remember telling Officer Brennan that the shooter had worn a yellow jumpsuit, defense counsel should have confronted him. Asking whether the witness "remembered" giving that description itself did not establish that he had given it.

Counsel attempted to show that Lyles had described the shooter as wearing a yellow jumpsuit by his follow-up question when he asked if the officer would be lying if he testified Lyles had told him so. Then, having suggested that Lyles had given a description of the shooter to Brennan that was inconsistent with his trial testimony, he did not call Brennan to confirm that he had. Instead, counsel left the jury to conclude that there was no factual basis for suggesting Lyles had described the shooter as having worn a yellow jumpsuit which was inconsistent with his testimony. In short, the jury did not learn that Lyles had given an earlier description of the shooter that did not fit Jones.

---

[49] *Jones V* at 8.

[50] *Id.* at 3-4.

In determining whether counsel's performance was deficient, we start with "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Counsel's choices are presumed to be part of a sound legal strategy even if it is not the most effective one.

A petitioner "must overcome the presumption that, under the circumstances, a challenged action might be considered sound trial strategy." *Id.* To overcome that presumption, "a *habeas* petitioner must show either that: (1) the suggested strategy (even if sound) was not in fact motivating counsel or, (2) that the actions could never be considered part of a sound strategy." *Thomas v. Varner*, 428 F.3d 491, 499 (3d Cir. 2005). The reasonableness of counsel's actions must be assessed "on the facts of the particular case, viewed as of the time of counsel's conduct." *Horn*, 395 F.3d at 102.

At the scene immediately after the shooting, Lyles and Rucker had identified the shooter as wearing a yellow jumpsuit. At trial, they identified the shooter as Jones, but did not testify he was in a yellow jumpsuit. Neither knew Jones before the shooting. Riggins, who knew Jones, testified he was not wearing a yellow jumpsuit. Someone else was. The jury never heard that Lyles and Rucker had reported that the shooter had worn a yellow jumpsuit. Considering these statements at the scene coupled with Riggins's testimony that Jones was not the man in the yellow jumpsuit, the jury could have concluded that Jones was not the shooter.

There was no reasonable strategic reason for not calling Bradley and Brennan to testify as to the statements Lyles and Rucker had made at the scene. Trial counsel gave two reasons for not calling them: ". . . I thought that I'd already impeached the testimony

of those witnesses [Lyles and Rucker]. And I wasn't gonna call the police."[51] His first reason was based on his misunderstanding of what was happening at the trial at that time. Revealing that he appreciated the significance of the statements as impeachable evidence, he testified, "I would think that the statements were introduced into evidence."[52] They were not. His second reason was that calling police for the defense "is a dangerous thing to do."[53] He explained that he did not trust the police witnesses to tell the truth. Although he did not bluntly characterize his decision that strongly, it is clear that is what he meant. That concern was not real. The statements were memorialized in the police reports the officers had prepared and their own statements to detectives. They could not have credibly retracted them.

Trial counsel did not have an understanding of the evidence or the discovery material. He simply missed or misread the significance of the yellow jumpsuit. In explaining his not calling Bradley, he stated: "So, why would I call Sergeant Bradley to say that Antonio Jones was wearing a yellow jumpsuit when the people who were there present said, they don't remember and didn't know."[54] This explanation reveals a misapprehension of evidence at trial.

First, Bradley could not have credibly testified that Jones was wearing the yellow jumpsuit. He was not there and no witness had told him that. Second, the witnesses who were there reported that the shooter was wearing a yellow jumpsuit. No one ever reported

---

[51] June 17, 2015 Evid. Hrg. at 15 (ECF 46).

[52] *Id.* at 22.

[53] *Id.* at 24.

[54] *Id.* at 40.

that Jones was wearing a yellow jumpsuit. Lyles had not told Bradley that Jones was wearing a yellow jumpsuit. Bradley could not have testified Lyles had identified the man in the yellow jumpsuit as Jones.

Bradley, at the scene of the shooting, broadcasted flash information on police radio, reporting that the shooting was committed by two males and "one of them was wearing a yellow jumpsuit." He repeated the same information in the same message. Thirty-two minutes later, he again stated the witness had described a man in a yellow jumpsuit.

Similarly, Brennan's report about what Lyles had told him about the shooter wearing a yellow jumpsuit was recorded on a 75-48 Incident Report and his formal written statement to a detective. In his statement, Brennan said that Lyles described the shooter as "wearing a yellow jumpsuit with a blue hoodie."[55]

In addition to erroneously believing that the initial statements had been introduced, counsel did not understand what evidence had been presented. He offered this explanation: "I'm not calling police officers to contradict civilians, who are on the street who are clearing my client . . . plain and simple, I am not doing that."[56] Lyles and Rucker, who had not identified Jones in their statements to the officers at the scene, did not "clear" Jones in their later statements to detectives or in their trial testimonies. On the contrary, they were eyewitnesses who identified him at trial as the shooter. Their statements at the scene, given outside the presence of each other, identified the shooter as dressed in a yellow jumpsuit. Coupled with the testimony of Riggins that Jones was not wearing a

---

[55] P/O Brennan IIR at 2 (ECF 48-4).

[56] June 17, 2015 Evid. Hrg. at 48-49.

yellow jumpsuit but another man was, their statements at the scene did not contradict anyone but themselves.

Although trial counsel explained another reason he did not call the officers was his distrust of police witnesses, he did call two other police witnesses at trial. Under these circumstances, the reason counsel gave at the evidentiary hearing (his reluctance to call police witnesses) did not actually motivate his decision not to call Officers Brennan and Bradley.

Trial counsel's proffered explanation for why he did not call Bradley and Brennan to impeach the eyewitnesses does not show or even suggest his decision was part of a sound trial strategy. His first explanation does not rest on a strategic choice. Counsel apparently thought he had impeached the witnesses when he had not and that their inconsistent statements had been introduced when they had not. His second reason – that he was wary of calling police witnesses – did not actually motivate his decision because he did call two police witnesses.

Given the facts of this particular case and assessing them at the time of trial counsel's conduct, we conclude that trial counsel's performance fell below an objective standard of reasonableness. Thus, we find that Jones has satisfied the deficient performance part of the *Strickland* test.

Showing that counsel's performance is deficient is not enough for *habeas* relief. The petitioner must also demonstrate a reasonable probability that the result of his trial would have been different had his attorney not erred. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." S*trickland*, 466 U.S. at 669.

Trial counsel's failure to use their prior inconsistent statements to impeach the eyewitnesses prejudiced Jones. As the Superior Court pointed out, the identification of Jones as the shooter was central to the prosecution and the prior statements cast doubt on that identification. The Superior Court unequivocally concluded that "[h]ad the jury heard this evidence, it may have cast serious doubt on the veracity of the eyewitnesses."[57] It further opined that because the prior inconsistent statements would have corroborated the defense theory, their admission could have "change[d] the outcome of [the] trial."[58]

Whether the witnesses had reported that the shooter was garbed in a yellow jumpsuit was critical to the defense. If the shooter was wearing a yellow jumpsuit and Jones was not wearing a yellow jumpsuit, he was not the shooter. If Jones was not the shooter, he was misidentified. The failure to present this evidence prejudiced the defense and, as the Superior Court found,[59] its presentation could have resulted in a different outcome. The guilty verdict was, at least, unreliable. Therefore, Jones has demonstrated that he was prejudiced by trial counsel's deficient performance in failing to impeach the eyewitnesses by their prior statements.

## Conclusion

Procedural default of the claim for ineffectiveness of trial counsel for failure to impeach the eyewitnesses is excused under both the inadequate bar rule and the *Martinez* exception. On *de novo* review, Jones has shown that his trial counsel's

---

[57] *Jones V* at 8.

[58] *Id.* at 4.

[59] Although the state court did not reach the merits of the ineffectiveness claim, it did make findings bearing on the issue. Specifically, the Superior Court found that had the prior statements to the officers at the scene been presented to the jury, the outcome of the trial may have been different. This finding was not an unreasonable application of the facts or the law.

performance was deficient and he was prejudiced by it.  Therefore, we shall conditionally grant a writ of *habeas corpus*.

/s/ TIMOTHY J. SAVAGE J.